SMITH GAINES v. THE STATE.

No. 1797.  Decided May 22, 1912.

Rehearing denied June 26, 1912.

**1.—Murder—Charge of Court—Manslaughter—Self-Defense.**

While the evidence may have justified the court in submitting murder in the second degree, yet the evidence on the part of the defense clearly raises the issue of manslaughter and self-defense, and the court should have submitted a charge on this phase of the case.

**2.—Same—Insult to Female Relative.**

Where, upon trial of murder, there was evidence that the deceased was trying to take away defendant's mistress who was under his protection and care at the time, and defendant interceded for her at the time the deceased was killed, the court should have submitted this matter as adequate cause upon the issue of manslaughter.

**3.—Same—Adequate Cause—Pain or Bloodshed.**

Where, upon trial of murder, there was evidence that defendant was attacked and stabbed in the back with a knife and this caused pain or bloodshed, the court should have submitted the issue of manslaughter.

**4.—Same—Charge of Court—Self-Defense.**

Where, upon trial of murder, there was evidence that others began shooting at defendant and that the deceased was killed while he stepped in between the parties, this phase of the case should have been submitted.

**5.—Same—Charge of Court—Provocation.**

Where, upon trial for murder, the court in his charge on manslaughter

entirely omitted the evidence with reference to a blow inflicting pain or bloodshed, and failed to instruct the jury with reference to the conduct of deceased towards defendant's mistress, the same was reversible error.

**6.—Same—Female Relative—Mistress.**

Where, upon trial of murder, the evidence showed the woman about whom the trouble arose was living with the defendant as his mistress at the time; that she was cooking for him and occupied all relations as if she were his wife, this under the statute placed her under his protection, and the statute with reference to an insult to a female relative applied and should have been given in the court's charge on manslaughter.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*R. E. Murrell, R. H. & Alice S. Tiernan,* for appellant.—On the question of the court's failure to submit a charge on manslaughter on the question of pain and bloodshed: Hill v. State, 8 Texas Crim. App., 142; Griffin v. State, 50 S. W. Rep., 366; Wharthan v. State, 55 S. W. Rep., 55; Renow v. State, 92 S. W. Rep., 112; Earles v. State, 94 S. W. Rep., 466; Gillespie v. State, 109 S. W. Rep., 158; Hightower v. State, 119 S. W. Rep., 691; Craft v. State, 122 S. W. Rep., 547.

On question of insulting conduct to female as adequate cause: Richardson v. State, 7 Texas Crim. App., 486; Weaver v. State, 19 id., 547; Turner v. State, 16 id., 378; Stanley v. State, id., 392; Ledbetter v. State, 9 S. W. Rep., 60.

On question of court's charge: Byrd v. State, 39 Texas Crim. Rep., 609; Stacy v. State, 48 id., 97; Brown v. State, 54 id., 121; Honeycutt v. State, 42 id., 132; Hjeronymous v. State, 47 id., 366; Barnes v. State, 57 id., 451.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question of adequate cause: Sargent v. State, 35 Texas Crim. Rep., 338; Carson v. State, 43 id., 265; Anderson v. State, id., 275; Thomas v. State, 49 id., 642; Bruster v. State, 50 id., 149; Hightower v. State, 53 id., 488.

DAVIDSON, Presiding Judge.—Appellant was given ten years in the penitentiary for murder in the second degree.

The statement of facts is in rather disjointed condition and does not present very intelligently the incidents, circumstances and facts attending the homicide. The first witness Alford testified that he was sometime called Charley Munroe, but that was his stepfather's name. He said: "I remember the occasion of Smith Gaines shooting Dick Vann on or about the 3d of August, 1907; it was in this county; Dick Vann is dead; died in the hospital; was right beside him when he died; both of us got shot at the same time." This is the evidence in this

record with reference to the death of Vann. We may suppose from this statement that Vann died from being shot by appellant. Appellant was tried in December, 1911. When Vann died is not stated. This witness was not before the grand jury, and he testified that this shooting occurred in August, but he did not know what date. Perhaps to make this as connected as it is possible from this record, it can be stated that appellant was living in the house where the homicide occurred with a woman named Georgia; that she was his mistress. She testified she had rented the house and permitted appellant to stay there until he could get employment. He testified he rented the house and was sleeping with her and had been sleeping with her as his mistress, and was the father of her youngest child. A witness named Grady testified that appellant had rented the house from him, Grady, for which he paid him $6 a month, and that the woman Georgia did not rent the house; that after this difficulty and appellant's disappearance the woman remained in the house for a while, but did not pay the rent and he put her out. Alford testified that he went to appellant's residence with some fish and requested a woman named Tiester to cook the fish. She said "I have no grease." Alford said, "I have some at the house," and she said, "I have no meal," and he said, "I will tell you what to do, you take this twenty-five cents and let your little boy go to the store and get some meal and a bucket of beer, and the other dime, let him have that," and she said, "All right," and he said, "I will go down and get the grease and by the time I got back the little boy was back from the store with the meal and beer, and so then I says, "Call the gentleman on the gallery and give him some beer;" that occurred just that way; did not know Dick Vann then; did not know none of the people there, only got acquainted with the people, Mrs. Tiester; was not over at Johny Smith's yard a short while before this killing; I have done told you I was not drunk that night; did not have any pistol over there because I was in my shirt sleeves; did not buy any fish from Johny Smith, bought it in town; did not tell Johny Smith a short while before this shooting that I was going over there and that I was going to raise hell over there in that yard that night; never saw Johny Smith; have known Johny Smith about seven months; don't know what he was doing at that time or where he was working."

On redirect examination he said he requested Mrs. Tiester to ask the man on the gallery to have some beer. Mrs. Tiester was the sister of Georgia, the woman with whom appellant was living. Dick Vann, the deceased, had not made his appearance at that time. Subsequently he came. The woman Georgia said that Dick Vann was her brother-in-law, and introduced him to witness as her brother-in-law. Witness further testified: "We did not get the fish cooked before the shooting occurred; at the time the shooting occurred, Dick Vann says, 'I am going now, do you want to go around to the gate with me;' I said, 'I won't mind it;' I walked on around the house; Vann went through

the house and I went on around and just as I got to the corner of the
gallery, I heard somebody say something, but there was no man sitting
on the gallery then because I was right at the corner, and I heard
some one off that way say something. I don't know who it was, and
about that time they shot and when they shot, I turned; that was the
first shot; I was in my shirt sleeves, and when they shot again, I turned
plumb around, and when I got turned around and started off, the next
shot struck me right there and I was going back the way I came from;
at the time of the first shot Dick Vann ran out the front gate; did
not see Smith Gaines then, the shot came from toward the house, but
like the opposite corner beyond where I was; I was on the east corner
and the pistol shot looked like on the west corner; that is not a very
large yard, but then you know there was another little cross fence and
a big China tree; that shot seemed like it might be right around that
China tree. At the time the shot was fired, I heard somebody make
an oath but I don't know who it was; he said, 'I will kill you if you
come a God damn step.' Dick Vann was not doing any shooting, and
had on a light coat and a light pair of pants; when he ran out the
gate there I did not see him with a gun; I was not that close to him
any way; I did not do any shooting there, I did not have any pistol
there."

The woman Georgia testified under the name of Georgia Mills, and
stated she rented the house, and sometimes appellant lived there; that
he had been there about nine months at the time of the shooting; that
he came to her broke; wanted a place to stay until he got a job. Vann
came there about eight o'clock; knew Vann near about two or three
years. "Smith Gaines came in just about half past five o'clock in the
evening; had a conversation with him that evening, he came in there,
he came running through the house with a six-shooter in his hand and
I took it away from him and he said that he was going to kill Will
Brown; talked to him and asked him what did Will Brown do to him,
and he said, 'Well, Brown had been talking about him carrying the
six-shooter, trying to turn him up to an officer' and he wanted to kill
him for doing that; that is what he told me; I am slightly acquainted
with Will Brown; Will Brown and Dick Vann were not the same men.
Will Brown is another man all together; he stayed right back of us.
Will Brown came over there that night when he heard the shooting;
was not there before the shooting to my knowledge because I works
out and don't get home until late in the evening; was there when the
shooting took place; was standing right opposite Dick Vann, that man
that was killed; Dick Vann did not have a gun; he was not trying to
shoot anybody; Smith Gaines shot Dick Vann; I heard Smith Gaines
shoot once and I goes to the door and said, 'Smith (I had begged him
not to shoot on my place when he first came in the place with the gun;
he was so mad he would do the shooting), please don't shoot before
my children, you don't know you are liable to kill,' and he said, 'You
will just have to get them out of the way.' I kept trying to get to him

to get the gun and he kept backing from me so that I could not get my hands on him; he shot Vann right here in the front leg. Vann was standing right beside me when he was shot; I was out on the ground, trying to get to Smith Gaines; that house had a gallery in front; had got off the gallery at the time; Smith Gaines was standing out a piece under a China-berry tree in the yard; after the shooting, Smith Gaines just walked away; he was not arrested there, never arrested him until they found him in Oklahoma and brought him here; he never gave them a chance; he was arrested two or three years afterwards; never saw him any more until he was brought back here."

On cross-examination, she saw Charley Munroe there that night. Munroe is the same witness who testified under the name of Alford. He was standing behind her. "Smith Gaines shot over my shoulder, this ball hit him in the leg; I stated that he shot over my shoulder and the ball went over my shoulder, came down and then went in the leg; could not have been hit any other way; did not see Charley Munroe with a pistol that night; he was not drinking any that night to my knowledge; Smith Gaines and Dick Vann had no trouble as I knows of; he said that he was after Brown; that he was the one he was after."

Grady testified that he had rented the place to defendant and not to the woman Georgia Mills, and that he received $6 a month as pay under the rental contract, and after appellant went away he got nothing for the rent; that Georgia Mills continued to remain there until he turned her out. She was behind $15 with him and he could not get the money. That he knew Charley Munroe and Will Brown; they lived behind where he lived in the second house; that they were in the habit of passing through this yard and he had notified them about passing through there before this trouble occurred.

John Smith testified that he lived next door to where the shooting occurred, and had a supper at his house, and Charley Munroe was there twice that night in his yard, and was drinking, and that he bought fifteen cents worth of fish from him, and had carried it over to appellant's house. The fish was uncooked and Munroe said they had to cook it for him; that Munroe at the time he was fixing up the fish for him had a pistol, and said he "was going to raise hell" that night. This witness told him he had better put his pistol up and not get in trouble. "He went off and came back again; he carried some fish over there to Smith Gaines house; said they were raw; I had cooked mine; I heard some noise over there; the first one I saw was Charley; he stepped down at the corner of the house, the east corner of the gallery, and then Georgia and Smith came on the gallery and ran to the northwest corner of the house under a China-berry tree, and when they got to shooting Dick Vann came out between them; Charley Munroe shot; had his pistol in my yard and said he was going to raise hell and I said, 'Go put it up.' Saw Will Brown that night; my kitchen window is right next to their back door and I saw him at the

back door; he was in the yard the first part of the night." This witness says he saw Charley Munroe alias Alford after the shooting; he was around home. Witness says he went around there; afterwards some one came along and told him Munroe was shot. Witness went to his house; he was in bed. "I said, 'Charley, are you shot,' and he said, 'Yes, but that son-of-a-bitch has got shot too.' I asked who it was, and he said, 'Smith Gaines.' I saw his pistol; it laid on the dresser and two balls shot out of it and one snapped. Saw Dick Vann after he was shot; he fell up against my gate and said, 'Get the doctor' for him, and he straightened up and went on to the corner house and fell there; he was shot right in the front side."

Appellant testified that he was proprietor of the house; stayed and slept with Georgia; they were not married; he had one child by her. He went in from his work on the occasion mentioned and Georgia and his baby were sitting on the gallery; he was not looking for any trouble, and had a letter from his mother stating that she was ill and at point of death. Georgia read it to him; he could not himself read. She asked him, "What time are you going?" He replied, "I am going tomorrow morning." He had just been paid off for working at the livery stable on McKinney Street. Georgia read the letter to him and he told her in reply to her question as to when he was going, said he "was going to take the first train out." She asked him when he would be back, and he replied that he did not know when he would be back. He had been sitting there at least twenty or twenty-five minutes when Dick Vann came in and said, "Howdy, Georgia;" she said, "Howdy, come in," and he said, "Well, I want to see the old man," and she replied, "He is not here." The old man was her father. She told him he was out on the sidewalk; he said, 'I would like to get to see him." She said, "Come in," and he came in and went through the bedroom and Georgia followed him, leaving appellant sitting on the front gallery, he and his baby. Then Vann returned, and Georgia with him, after they had been in the house about five minutes. He said, "Georgia, I could not do anything unless you were there." She said, "Come in" and he went in. She was sitting by appellant, and appellant said, "What is it he wants" and she said, "The old man ain't here, nobody working but you and he wants money from you." "I said, 'None of you get money from me, I am going to Austin tomorrow to see my mother, to see where she is buried at, I would like to have been up there to see the death,' and she said, 'That is all to it.' I said, 'That is all there is to it' and I said, 'I am going tomorrow morning.'" She got up and went back into her room, and deceased came out and said, "Come on woman if you are going. She went in and put on her coat, apron and shoes and came walking out of the room arm in arm with Dick Vann, and he, appellant, said, "Where are you going?" and "she says to me, 'Can I go with him?' I said, 'Do you want to go?' She said, 'No.' I said, 'Then don't go.' He said, 'Come on and go with me woman if you are going;' I still sits there as they comes to

the end of the gallery; I gets up and walked side by side with them and just as I struck the end of the gallery I got cut and I whirled around and said, 'What is the matter with you fellows?' I got hit, and I fell, then got to my knees; I crawled to the front gallery opposite where I was sitting there. I tried to pull the chair to me so I could rest on the chair; couldn't reach the back of the chair, they were still shooting at me; I did not know him or Will Brown, they were shooting at me; I did not bother with any of them out there, did not visit any of them; never had had any trouble with Dick Vann before that."

This testimony, without repeating more of it, as written is to the effect that appellant was shooting at Will Brown and was being shot at by Brown and Alford, alias Munroe, and that he was not only cut in the back but also shot in the leg. He fired two shots, one of which struck Vann, and the other Alford, alias Munroe. We judge from this record that Vann was killed by the wound and Munroe was not. Brown's testimony is to the effect that he was there at one corner of the gallery and appellant was at the opposite corner, but witness did not shoot. Appellant put in evidence his good reputation, his witnesses to this effect being Messrs. Lewis R. Bryan and John S. Stewart. This is not a very intelligent statement of the case, but from the statement of facts as found in the record it is about as intelligent as the writer can make it.

From this record there may possibly be sufficient evidence to justify the court in submitting murder in the second degree. The evidence on the part of the defense clearly raises the issues of manslaughter and self-defense. If appellant, as he testifies, was attacked and stabbed in the back with a knife and this caused pain or bloodshed, and he shot under the impulse of the moment, the offense could not possibly be higher than manslaughter, and if, as he testifies, the parties began shooting at him, then he was justified in killing any or all of the parties engaged in it. If he shot at Brown or Munroe justifiably and Vann stepped in between them, as the testimony of John Smith indicates, and received one of the balls intended for one of the other parties, appellant would not be guilty of any offense; he would be justified. This is predicated upon the testimony that the parties were shooting at appellant and John Smith's testimony to the effect that while the shooting was going on Vann stepped in between the firing party.

If Vann was trying to take the woman Georgia away from the house of appellant against her consent as appellant testified, then the issue of manslaughter was presented from that standpoint. Although she was his mistress, yet she was under his protection and care at the time, therefore under the statute, this would constitute the relationship which justified appellant in protecting her, and under the law of manslaughter would constitute adequate cause.

The charge of the court, after informing the jury that the provocation must arise at the time of the act and the act must be directly

caused by passion arising out of the provocation, and definitions of what is passion and adequate cause, instructed the jury:

"Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation (if any) to consider in connection therewith, all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind, in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law, and so in this case you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing, and the adequacy of the cause (if any) producing such condition."

The court then instructed the jury if they believed from the evidence, etc., that appellant killed with a deadly weapon, in a sudden passion arising from an adequate cause, as before explained, and not in defense of himself, they would convict him of manslaughter. It will be observed that the charge omits entirely to submit the law of manslaughter with reference to a blow inflicting pain or bloodshed, and fails to instruct the jury with reference to the conduct of Vann towards his mistress, Georgia Mills. A charge on both aspects of this testimony should have been given, and appellant's contention is correct that this omission is fatal error.

For the error indicated the judgment is reversed and cause is remanded.

*Reversed and remanded.*

ON REHEARING.

June 26, 1912.

DAVIDSON, Presiding Judge.—On a former day of the term the judgment was reversed and the cause remanded. The district attorney of the Criminal District Court of Harris County has filed a motion for rehearing. The contention is that the court was in error in reversing the judgment because a proper charge on manslaughter was not given. It is unnecessary to review the opinion. It states the matter fully, but in overruling the motion for rehearing I desire to state that appellant was cut in the back with a knife. The facts rather indicate, and perhaps sufficiently, that Vann, the deceased, was the man who cut him, Vann was at the time of the cutting with appellant's mistress, and was taking her away from the house of appellant and over her protest. Appellant had notified her that she need not go, and this brought about the cut in the back on the part of Vann. This brings up two issues, first, an assault and battery, causing both pain and bloodshed. This required a distinct charge on manslaughter. The second issue is that it was such an insult to a female relative within the contem-

plation of the law as required a charge submitting distinctly that theory of the law. The district attorney says that he does not understand how the mistress of a man living with him a shameless life could be a female relative under the terms of the statute. The charge is not governed by what the prosecution does or does not understand. The statute provides that any female under the permanent or temporary protection of the accused at the time of the killing shall also be included within the meaning of the term relative. It does not make virtue of the woman the criterion of protection or of relationship. She may be a female under his protection though she be not virtuous. The evidence is uncontroverted that appellant and the woman were living together, and had been living together for sometime, his testimony showing that he had been renting the house and keeping her there as his mistress. She was cooking for him and occupied all relations for him as if she was his wife except the relations were illicit. He was the father of her youngest child. Whether the relation of mistress or wife existed would make no difference under the statute. She was under his protection, and he had the legal right to protect her under the law of manslaughter. Where statutory grounds exist or are shown; the charge must affirmatively present them. Branch's Crim. Law, section 512, for collation of authorities.

The motion for rehearing is overruled.

*Overruled.*